UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| SEBASTIAN CORREA MORALES, | ) | Hon. Natasha C. Merle |
| *Petitioner,* | ) | |
| | ) | Civ. No. 24-7951 |
| -against- | ) | |
| | ) | |
| JULIANA ESCOBAR RESTREPO, | ) | |
| *Respondent.* | ) | |

**RESPONDENT'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

Juliana Escobar Restrepo ("Respondent"), by and through her attorneys, respectfully

submits her Proposed Findings of Fact and Conclusions of Law. Where no specific proposed

exhibit or document in the record is cited in support of a finding of fact, Respondent will rely on

her testimony and that of her witnesses at trial in support of said fact.

**I.        Proposed Findings of Fact**

(1)      It is uncontroverted that Plaintiff and Respondent were married in Queens County,

New York on September 20, 2015, and that their biological child ("the Child") was born January

30, 2020 in Miami, Florida. ECF 1; ECF 14.

(2)      At Plaintiff's urging, the parties and the Child relocated to Medellin, Colombia in

December 2021. ECF 1; ECF 14.

(3)      In about August 2022, the parties' marriage disintegrated, and Respondent

remained the Child's custodial parent. ECF 14.

1

(4)    Respondent is certified as a physician's assistant in the United States. She was unable to find employment in her field in Colombia. In addition to the costs of supporting herself and the Child, Respondent was carrying substantial student debt, and Plaintiff was not providing support equal to her needs and the Child's. In late 2023, Respondent realized she would have to move back to the United States if she was to find employment in her field and thus support herself and her child. See e.g. Exh. R11 - R14, R16, R17.

(5)    Escobar discussed the move with Plaintiff, and Plaintiff consented to Respondent and the Child moving back to the United States. *Id.*

(6)    Respondent planned to move in late January 2024. *Id.*

(7)    Like Respondent, Plaintiff is a naturalized citizen of the United States. He is a high-earning information technology specialist who works remotely for U.S.-based companies and routinely travels to and from the U.S. and overseas. Both Plaintiff and Respondent have extensive family ties in Florida, New Jersey, and New York.

(8)    The parties agreed that Respondent would remain the Child's custodial parent and that Plaintiff would visit the Child in the United States as often as he liked. Exh. R1, R11-c.

(9)    In about early January 2024, Plaintiff registered the Child as a Colombian citizen and obtained a Colombian passport for him, without Respondent's knowledge or consent. Exh. P2.

(10)    Just as Respondent was preparing to move with the Child to the United States, she learned from Colombian immigration authorities that, because the Child was now a Colombian citizen, she must obtain written authorization from Plaintiff for the Child to travel outside Colombia without Plaintiff. ECF 1, 14.

2

(11)     Plaintiff provided a written authorization for the Child to travel to the U.S. with Respondent on January 26, 2024. The authorization provided a "return date" of May 15, 2024 and indicated that the purpose of the trip was "tourism." The parties understood at the time that Plaintiff's written authorization was a ministerial requirement, that the May 15 return date was provided with a view to the Child traveling from the U.S. to visit family in Colombia on or about that date, and that the purpose of the trip was not tourism but, rather, Respondent and the Child's permanent relocation to the United States. See e.g. Exh. P7.

(12)     On January 26, 2024, Respondent and the Child flew from Medellín to Florida, where Respondent had made plans for them to stay with her relatives while she sought employment.

(13)     On or about February 15, 2024, Plaintiff filed a Complaint for Divorce in the Superior Court of New Jersey, Chancery Division. The Complaint alleged that Plaintiff resided in Kearney, New Jersey and that Respondent and the Child resided at 20-34 146th Street in Queens County, New York. The Complaint requested a judgment whereby Respondent would retain custody of the Child and Plaintiff would pay Respondent child support in the amount of $1,210 weekly, in accordance with New Jersey child support guidelines. Exh. R1.

(14)     Respondent and the Child resided in Florida with Respondent's relatives through the month of May as she continued her search for a permanent job. Plaintiff visited with the Child in Florida on at least two occasions, and returned the Child to the Florida home after the visit was concluded. Respondent enrolled the Child in a local preschool, and the Child enjoyed play and social time with friends, relatives, and family members in Florida throughout his time there. Exh. R2, R13 - R22.

(15)     In March 2024, Plaintiff proposed taking the Child on a trip to Europe with Plaintiff's family, departing May 25, 2024, returning the Child to Respondent in the United States on June 7, 2024. The Child would then take a 15-day trip to Colombia in July 2024, at the conclusion of which he would return to the United States. These plans were ultimately cancelled and and Plaintiff instead proposed that Respondent and the Child visit Colombia together in late May. Exh. R20 - R21.

(16)     Respondent communicated to Plaintiff that she was wary of the Child visiting Colombia before a formal custody order was entered, fearing that Plaintiff would deny further authorizations for the child to travel to the United States and thus force Respondent and the Child to remain in Colombia at Plaintiff's pleasure. See e.g. Exh. R23, R35.

(17)     In response, Plaintiff threatened Respondent that if she did not agree to his demand that she take the Child on a visit to Colombia, "the dynamic would change" and he would "do anything in his power to cause problems" for Respondent. Exh. R45.

(18)     In early May 2024, Respondent and the Child traveled to New York City to visit the Child's maternal grandmother, who was about to undergo a surgical procedure. Respondent and the Child stayed with Respondent's stepfather in Queens County throughout the month of May.

(19)     As the New Jersey divorce proceeding was still pending, Respondent elected to remain in New York while litigating the divorce. She sought the counsel of multiple attorneys and learned that the New Jersey divorce would likely be dismissed by the Chancery Court because, despite Plaintiff's sworn allegation to the contrary, neither she nor Plaintiff were residents of New Jersey. Exh. R33-a.

(20)    In late May 2024, Respondent accepted a job offer in New York City and signed a

lease for an apartment in Queens, which she and the Child would occupy starting in June.

(21)    In early June, Respondent enrolled the Child in a summer day-camp program in

New York. The parties discussed Respondent's search for a New York City preschool at which to

enroll the Child for the Fall 2024 semester, and Respondent sent Plaintiff information and web

links to a school she had visited and found acceptable, encouraging him to research and even

visit the school. The parties communicated daily or nearly daily about the Child's daily life, his

life at day-camp and, later, in preschool. It is evident that the Child had fully adjusted to his life

in New York and was thriving. Exh. R2, R25 - R30, R36, R41.

(22)    The parties agreed that on or about June 8, 2024, Plaintiff was to pick up the

Child from Respondent in Queens and take him to Kearney, New Jersey to stay with Plaintiff and

his relatives through June 15, 2024; and Plaintiff did pick up the Child, take him to his family's

home in Kearney, and return him to Respondent as agreed. Exh. R26.

(22)    In about July 2024, the parties discussed how they would proceed with their

divorce. Plaintiff encouraged Respondent to file for divorce in Queens County, but Respondent

communicated to Plaintiff did not wish to do so because, after consulting with local attorneys,

she learned that had not been a New York State resident long enough for a New York State court

to assume jurisdiction over the divorce, and the action would be a waste of time and money, as

Plaintiff's divorce action in New Jersey had proved to be. Exh. R33-a.

(24)    In August, Respondent communicated to Plaintiff that the Child was enrolled in

Promise Christian Academy in New York. Plaintiff inquired about the Child's progress at the

school, and sent Respondent money for a new bed for the Child's room in the Queens County

5

apartment. Exh. R37.

(25)    Via text, the parties agreed that on or about August 22, 2024, Plaintiff would pick up the Child in Queens and stay with the Child in Kearney, New Jersey, as he had done in June. But instead of taking the Child to Kearney as promised, Plaintiff informed Respondent by text message that he and the Child were taking a flight to Florida to visit with Plaintiff's family in Orlando and Miami and Florida, and would return to New York on September 2, 2024. Alarmed, Respondent reported Plaintiff's abduction of the Child to the New York Police Department. Fearing that Plaintiff planned to remove the Child to Colombia, she filed a Request with the U.S. Department of State, for Entry Into Children's Passport Issuance Alert Program. Exh. R38 - R39.

(26)    Plaintiff returned the Child to Respondent on September 2, 2024, and the Child continued to attend Promise Christian Academy in Queens as he had previously, with Plaintiff's knowledge and consent. Plaintiff communicated to Respondent his dissatisfaction that she would not consent to the Child visiting Colombia, even if accompanied by Respondent. Respondent's reluctance to allow the Child to travel to Colombia stemmed from her fear that Plaintiff would retain him there. Plaintiff's abduction of the Child to Miami in August was traumatic to Ms. Escobar, and stoked her fear that once in Colombia, Plaintiff would not authorize the Child's return to the U.S., and both she and her child would be trapped in Colombia. Exh. R39.

(26)    On November 15, 2024, Plaintiff brought the instant Petition in bad faith, to make good on his threat to "change the dynamic" of his relationship with Respondent and "create problems" for her if she did not comply with his demands.

6

(27)     Whatever disagreements may have existed between the parties with respect to the Child's specific living arrangements or his visiting Colombia outside the United States, the parties understood and agreed that Respondent and the Child were moving to the United States permanently in January 2024.

(28)     Petitioner concedes that Respondent is, has been, and should continue to be the Child's custodial parent. She has provided the Child with food, shelter, medicine, education, affection, attention, and care as befits a young child since the parties separated in August 2022, less than a year after their move to Colombia, and continues to do so.

(29)     At the time that Petitioner claims Respondent unlawfully retained the Child, the Child was fully acclimated to life in the United States, and enjoying a full and healthy life among his friends, family, and schoolmates in Florida, New Jersey, and New York.

## II.     Proposed Conclusions of Law

(30)     A determination of habitual residence under Article 3 of the Hague Convention is a mixed question of law and fact. See e.g. *Guzzo v. Cristofano*, 719 F.3d 100, 109 (2d Cir. 2013)

(31)     Both the United States and Colombia are signatories to the Hague Convention. See *Arboleda v. Arenas*, 311 F. Supp. 2d 336, 340 (E.D.N.Y. 2004).

(32)     The Hague Convention entered into force in the United States on July 1, 1988, for the purpose of "protect[ing] children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." Hague Convention,

Preamble; 53 Fed. Reg. 23843. On the date that Congress adopted the Convention, it also passed

ICARA to implement the multilateral treaty. 42 U.S.C. § 11601 et seq.; 53 Fed. Reg. 23843. The

Hague Convention is specifically designed to prevent the removal or retention of children by

close family members.

(33)    "To deter family members from removing children to jurisdictions more favorable

to their custody claims in order to obtain a right of custody from the authorities of the country to

which the child has been taken, the Hague Convention attempts to deprive [their] actions of any

practical or juridical consequences." *Gitter v. Gitter*, 396 F.3d 124, 129-30 (2d Cir. 2005)

(internal quotations omitted). The Hague Convention adopts the principle that the child's country

of "habitual residence" is "best placed to decide upon questions of custody and access." *Croll v.*

*Croll*, 229 F.3d 133, 137 (2d Cir. 2000) (internal quotations omitted).

(34)    In the instant matter, Petitioner has invoked the Convention for the objective of

removing the Child to a state whose custody laws are more favorable to Petitioner and thus to

exert control over Respondent.

(35)    In order to prevail on a claim under the Hague Convention for the return of a

child, a petitioner must first establish by a preponderance of the evidence that the child was

wrongfully removed or retained within the meaning of the Convention. 42 U.S.C. § 11603(e)(1)

(A).

(36)    The Second Circuit has noted that Article 1 of the Hague Convention states that a

retention or abduction is "wrongful" when such action is in violation of custody rights granted by

the country "in which the child was habitually resident immediately before the removal or

retention." *Arboleda v. Arenas*, 311 F. Supp. 2d 336, 341 (E.D.N.Y. 2004), citing *Croll v. Croll*,

8

229 F.3d at 137.

(37)    In the instant matter, Petitioner must first show that the Child was "habitually resident" in Colombia at the time Petitioner alleges Respondent retained him. The Hague Convention does not itself provide any definition of "habitually resident." However, the Second Circuit has held that analysis of a child's habitual residence begins with consideration of the relevant intentions, normally "the intent of the child's parents or others who may fix the child's residence." *Gitter v. Gitter*, 396 F.3d 131-32. Where the parents disagree as to the place they intended to be the child's habitual residence, it is the court's task to determine the intentions of the parents as of the last time that their intentions were shared. *Id.* at 133. "In making this determination the court should look, as always in determining intent, at actions as well as declarations." *Id.* at 134.

(38)    While the shared intent of the parents normally controls the habitual residence of the child, courts must also inquire whether the available evidence "unequivocally points to the conclusion that the child has acclimatized to [a] new location and thus has acquired a new habitual residence" notwithstanding the parents' intentions. *Id.*

(39)    The evidence in the record shows that the parties intended for the Child to reside in the United States. Accordingly, the Child's habitual residence is the United States. Whatever disagreements existed between them with respect to the Child's living arrangements in the United States, whether the Child was to live in Florida or New York, and whether and how often the Child would visit Colombia, the parties unambiguously understood and agreed that the Child was moving to the United States permanently.

(40)    Petitioner understood that Respondent's purpose in coming to the United States in January 2024 was for Respondent to find employment in the United States as a physician's assistant. Petitioner further understood and accepted that Respondent would continue to be the Child's custodial parent. Petitioner acquiesced to Respondent bringing the Child with her to the United States by executing a written authorization for the Child to travel to the U.S. with Respondent in January. Petitioner's claim that he only authorized the Child to travel to the U.S. temporarily, for "tourism," is belied by his numerous communications with Respondent, before and after her January departure, concerning Respondent's job prospects in Florida and New York, and arrangements for housing, day care and schooling, and medical insurance in the U.S. Petitioner contradicts himself in his pleadings in this matter, alleging at once that Respondent and the Child was "temporarily moving" to the United States and also that his intentions for the Child were that he visit the U.S. as a tourist.

(41)    In light of this conclusion, the Court need not consider whether, notwithstanding his parents' intentions, there is evidence "unequivocally point[ing] to the conclusion" that the the Child has acclimatized to his new residence in the United States.

(42)    Nonetheless, the evidence in the record shows that the Child has acclimatized to his new residence in the United States. He is enrolled in preschool and is thriving there. He is seen by a pediatrician in New York State. He is surrounded by family and friends in New York, New Jersey, and Florida and engages in play and social activity as befits a child his age.

(43)    Having determined that the Child's habitual residence is the United States, the Court need not consider whether the Child was removed or retained in breach of petitioner's custody rights, or whether Petitioner was actually exercising his custody rights.

(44)    Because Petitioner has failed to establish that the Child was removed from his

habitual residence or retained in another state, Petitioner has likewise failed to establish wrongful

removal or retention of the Child within the meaning of the Hague Convention.

(45)    The scope of a court's inquiry under the Hague Convention is limited to the merits

of the abduction claim. ICARA specifically provides that the Convention and its implementation

"empower courts in the United States to determine only rights under the Convention and not the

merits of any underlying child custody claims." 42 U.S.C. § 11601(b)(4); and seem, e.g.,

*Arboleda v. Arenas*, 311 F. Supp. 2d 336, 340 (E.D.N.Y. 2004).

(46)    Accordingly, the Court should deny the Petition in its entirety.


                                                    Respectfully submitted,



Dated:  New York, New York
        January 31, 2025                            /s/ Edgar Loy Fankbonner
                                                    Edgar Loy Fankbonner
                                                    Goldberger & Dubin, PC
                                                    401 Broadway, Suite 306
                                                    New York, New York 10013
                                                    Tel. (212) 431-9380
                                                    fankbonner@gmail.com

CERTIFICATE OF SERVICE

I certify that I caused a true and correct copy of the foregoing submission to be served upon the following parties by uploading a true and correct copy thereof to the Court's ECF portal:

Camilla Redmond, Esq.,
Richard Min, Esq., and
Michael Banuchis, Esq.
Costal Green Kaminer Min & Rockmore LLP
420 Lexington Ave. Ste. 2821
New York, NY 10170

Dated: New York, New York
        January 31, 2025

/s/ Edgar Loy Fankbonner
Edgar Loy Fankbonner
Goldberger & Dubin, PC
401 Broadway, Suite 306
New York, New York 10013
Tel.: (917) 796-7406
fankbonner@gmail.com
*Attorneys for Respondent*
