**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
_____

SEBASTIAN CORREA MORALES,     )
     )
     )
     Petitioner,     )
     )     Case No. 1:24-cv-07951
vs.     )
     )
JULIANA ESCOBAR RESTREPO,     )
     )
     )
     )
     Respondent.     )
_____)

## PETITIONER'S POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Richard Min
Michael Banuchis
Green Kaminer Min & Rockmore LLP
420 Lexington Avenue, Suite 2821
New York, New York 10170
Telephone: 212-681-6400
Facsimile: 212-681-6999
Email: rmin@gkmrlaw.com
Email: mbanuchis@gkmrlaw.com

_COUNSEL FOR PETITIONER_
_SEBASTIAN CORREA_

## TABLE OF CONTENTS

**II. PROPOSED FINDINGS OF FACT**…………………………………...……………6

A.  Parties' Early Relationship, Marriage, and the Birth of L.C.…………………….....................6

B.  Establishing Colombia as the Child's Habitual Residence……………………..…………..6

C.  L.C.'s Life in Colombia…………………………………………………..………...8

D.  Discussions Surrounding L.C.'s Move to the United States………………...…………..9

E.  L.C.'s Departure to the United States in January 2024……………………..………...10

F.  The Move to the United States was Temporary and Conditional……………….…………12

G.  Respondent's Move to New York……………………………………………………13

H.  The Wrongful Retention of L.C. in New York………………………………….…………15

I.  Procedural History………………………………………………………….…………15

**III. PROPOSED CONCLUSIONS OF LAW**………………………………………...16

A. The Hague Convention Framework………………………………………….…………16

B. Petitioner Has Established a *Prima Facie* Case Under the Hague Convention……………19

    i. The Date of Wrongful Retention is May 16, 2024…………………………………21

    ii. L.C.'s Habitual Residence on May 16, 2024 was Colombia……………….…..............22

    iii. The Parties Did Not Have a Shared Intent to Shift L.C.'s Habitual Residence to The United States…………………………………………………………………….......24

    iv. The Move to the United States was Temporary, Conditional and on a Trial Basis….26

    v. The Child Did Not Acclimatize to Life in the United States …………………….…..28

    vi. The Child Did Not Acclimatize to Life in New York……………….…………....30

C. Affirmative Defense of Consent……………………………………………..……......31

    i. The Court Does Not Have to Advance Respondent's Consent Inquiry…………..…..32

ii. Respondent Did Not Establish That Petitioner Consented to L.C.'s Permanent Retention……………………………………………………………………………………33

iii.  Petitioner's Agreement for L.C.'s Move was Subject to Several Conditions……..…37

**IV. CONCLUSION**………..……………………………………………………………......39

## <u>TABLE OF AUTHORITIES</u>

Cases------------------------------------------------------------------------------------------------------Page

 *Abbott v. Abbott*, 560 U.S. 1 (2010)……………..…...…………………………………..16, 33

*Aguirre v. Calle,* No. 08 CV 2613 SJ/SMG, 2008 WL 4461931 (E.D.N.Y. Oct. 3, 2008)….19, 20

*Asvesta v. Petroutsas,* 580 F.3d 1000 (9th Cir. 2009)………………………………………..…33

*Baxter v. Baxter,* 423 F.3d 363 (3d Cir. 2005)…………………………………...…..33, 34, 37, 38

*Berezowsky v. Ojeda*, 765 F.3d 456 (5th Cir. 2014)…………………………………..……………28

*Blackledge v. Blackledge*, 866 F.3d 169 (3d Cir. 2017)…………………………..…………...21

*Calixto v. Lesmes*, 909 F.3d 1079 (11th Cir. 2018)…………………………………….…26, 27

*Castang v. Kim*, No. 1:22-CV-05136-SCJ, 2023 WL 1927027 (N.D. Ga. Feb. 9, 2023), aff'd, No. 23-10426, 2023 WL 3317983 (11th Cir. May 9, 2023)………………………..……………...30

*Chechel v. Brignol*, No. 510-CV-164-OC-10GRJ, 2010 WL 2510391 (M.D. Fla. June 21, 2010)……………………………………………………………………………………….……21

*Cuellar v. Joyce*, 596 F.3d 505 (9th Cir. 2010)…………………………………………….....33

*Didon v. Castillo*, 838 F.3d 313 (3d Cir. 2016)……………………………………….…………21

*Ermini v. Vittori*, 758 F.3d 153 (2d Cir. 2014)………………………………...…………24, 26

*Feder v. Evans–Feder*, 63 F.3d 217 (3d Cir.1995)……………………………….…………...28

*Friedrich v. Friedrich*, 78 F.3d. 1060, 1066 (6th Cir. 1996)…………………….…………….20

*Garcia v. Angarita*, 440 F.Supp.2d 1364 (S.D.Fla.2006)………………...………………20, 34

*Giampaolo v. Erneta*, 390 F.Supp.2d 1269 (N.D.Ga. 2004)……………………………………34

*Gitter v. Gitter*, 396 F.3d 124 (2d Cir. 2005)…………………………...…….…24, 27, 28, 31

*Golan v. Saada,* 596 U.S. 666 (2022)……..………………………………………...……..16

*Hiroki v. Hiroki*, 698 F. Supp. 3d 1023 (N.D. Ohio 2023)……………………………………30

*Hofmann v. Sender*, 716 F.3d 282 (2d Cir. 2013)……………………………………………..37

*In re R.V.B.*, 29 F. Supp. 3d 243 (E.D.N.Y. 2014)……………………………………………...33

*Redmond v. Redmond*, 724 F.3d 729 (7th Cir. 2013)…………………………………………30

*Marks v. Hochhauser*, 876 F.3d 416, 418-19 (2d Cir. 2017) (citations omitted)……………..…18

*Matter of E.Z.*, No. 1:21-CV-06524-MKV, 2021 WL 5106637 (S.D.N.Y. Nov. 2, 2021)……...22

*Maxwell v. Maxwell*, 588 F.3d 245 (4th Cir. 2009)……………..…………………………………..26

*Monasky v. Taglieri,* 589 U.S. 68, 140 S. Ct. 719, 206 L. Ed. 2d 9 (2020)…………..……. *passim*

*Moreno v. Martin*, 2 No. 08-22432-CIV, 2008 WL 4716958 (S.D. Fla., Oct. 23, 2008)…....34, 35

*Mota v. Castillo*, 692 F.3d 108 (2d Cir. 2012)……………………………………..…...26, 30

*Mozes v. Mozes*, 239 F.3d 1067 (9th Cir. 2001)……………………………………………28

*Mene v. Sokola*, No. 22 CIV. 10333 (KPF), 2024 WL 4227788 (S.D.N.Y. Sept. 17, 2024)……31

*Neiuwenhoven v. Pisani,* No. 5:23-CV-34-GAP-PRL, 2023 WL 4930852 (M.D. Fla. Feb. 23, 2023)……………………………………………………………………………………..28

*Nicolson v. Pappalardo*, 605 F.3d 100 (1st Cir.2010)…………………………………………...25

*Nissim v. Kirsh*, 394 F. Supp. 3d 386 (S.D.N.Y. 2019)………………………………………30

*Papakosmas v. Papakosmas,* 483 F.3d 617 (9th Cir. 2007)……………………………………..29

*Poix v. Susibel Altagracia Espaillat Santana*, No. 22 CIV. 4980 (JPC), 2022 WL 9847347 (S.D.N.Y. Oct. 17, 2022)………………………………………………… ………………………24

*Prinz v. Faso*, 03–CV–6653, 2004 WL 1071761 (W.D.N.Y. May 12, 2004)…………….……..25

*Saavedra v. Montoya*, No. 21-CV-5418(EK)(VMS), 2023 WL 2910654 (E.D.N.Y. Apr. 12, 2023), *appeal withdrawn,* No. 23-694, 2023 WL 5600054 (2d Cir. Aug. 4, 2023)…………….20

*Saada v. Golan*, 930 F.3d 533, 539 (2d Cir. 2019) (citation omitted)……………..…………..24

*Soulier v. Matsumoto*, No. CV 20-4720, 2022 WL 2666946 (D.N.J. July 8, 2022)…………….35

*Sundberg v. Bailey*, 293 F. Supp. 3d 548 (W.D.N.C. 2017), aff'd, 765 F. App'x 910 (4th Cir. 2019)……………………………………………………………………………………………29

*Swett v. Bowe*, 733 F. Supp. 3d 225 (S.D.N.Y.)………………………………………21, 36

*Tereshchenko v. Karimi*, No. 23CV2006 (DLC), 2024 WL 80427 (S.D.N.Y. Jan. 8, 2024), aff'd in part and remanded, 102 F.4th 111 (2d Cir. 2024)……………………………..……….…...24

*Urquieta v. Bowe*, 120 F.4th 335 (2d Cir. 2024)…………………..……………..………..21, 36

*Valles Rubio v. Veintimilla Castro*, No. 19-CV-2524, 2019 WL 5189011 (E.D.N.Y. Oct. 15, 2019), *aff'd*, 813 F. App'x 619 (2d Cir. 2020)……………………………………………...33

## <u>OTHER AUTHORITIES</u>

International Child Abduction Remedies Act, 22 U.S.C. §§ 9001-11…................................. *passim*

Convention on the Civil Aspects of International Child Abduction……………………….*passim*

## I.    <u>PROPOSED FINDINGS OF FACT</u>

### A.    **Parties' Early Relationship, Marriage, and the Birth of L.C.**

1.    Petitioner Sebastian Correa is the father of L.C. PX-2[1], Bates No. SC000004.

2.    Respondent Juliana Escobar Restrepo is the mother of L.C. *Id.*

3.    The parties are dual citizens of Colombia and the United States. PX1, Bates No. SC000001, PX2, Bates No. SC000004; *See also* Tr. 119: 4-9 and Tr. 225: 2.

4.    Both parties were born in Medellin, Colombia. Tr. 66:5; Tr. 195:14.

5.    The Child is a dual citizen of Colombia and the United States. PX2, Bates No. SC000004.

6.    Petitioner and Respondent met in October 2014 in Colombia and became romantically involved shortly thereafter. Tr. 66:10-13; Tr. 196:10.

7.    Respondent returned to New York in January 2015, and Petitioner relocated to New York to live with her in July 2015. Tr. 67: 6-7; Tr. 196:18-25.

8.    Petitioner and Respondent married on September 15, 2015, in New York. Tr. 66:19-23; Tr. 197:1-2.

9.    At the end of summer 2019, Petitioner and Respondent moved to Miramar, Florida. Tr. 69:6-7; Tr. 198:15-16.

10. In January 2020, the Child was born in Miami, Florida. PX2, Bates No. SC000004.

### B.    **Establishing Colombia as the Child's Habitual Residence**

11. In December 2021, the parties and the Child moved to Medellin, Colombia. Tr. 69:18-25; Tr. 202:18-19.

---

[1]     The abbreviations "PX1, PX2" etc. refer to Petitioner's Exhibits; "RXA, RXB" etc. refer to Respondent's Exhibits.

12. Petitioner and Respondent sold their sofa and dining table and brought the rest of their belongings to Colombia. Tr. 71:17-22.

13. The parties did not keep any belongings in the United States when they relocated to Colombia with the Child. *Id* at 23-25.

14. Upon their arrival to Colombia, Respondent and Petitioner were living in between the marital home they were building in El Carmen, Colombia and Petitioner's mother's home in Itaqui, Colombia. Tr. 72:16-22.

15. The parties worked remotely from Colombia. Tr. 209:13-17; Tr. 121:25; Tr.122:1-5; Tr. 76:1-4.

16. Respondent worked in Colombia until approximately April 2022. Tr. 159:8-10; Tr. 205:24-25; Tr. 206:1-2; Tr. 206:20-21.

17. Petitioner's entire family resides in Colombia, including his mom, his dad, his brother, his sister, his two grandmothers, his grandfather, ten aunts and uncles, and his cousins. Tr. 76:12-15.

18. The majority of Respondent's family also lives in Colombia, including her mother, her father, her aunts and uncles, her cousin and her grandmother. Tr. 76:16-21.

19. In August 2022, the parties separated. Tr. 74:25; Tr. 75:1.

20. In November 2022, Respondent moved in with her mother (Tr. 212:12-14) and Petitioner moved into his mother's house. Tr. 74:25; Tr. 25:1-5.

21. At their mother's homes, they were living in the same city in Colombia, five minutes away from each other. *Id.*

22. Despite not having legal ownership of their marital home (Tr. 134:10-20), the parties considered it a marital asset as they split the cost of the property equally upon their separation. Tr. 74:3-7; Tr. 267:3-14.

23. In February 2023, Petitioner bought Respondent an apartment in her mother's building in Itaqui, Colombia. Tr. 75:11-17.

24. Thereafter, Respondent and the Child moved into that apartment. *Id.*

25. Respondent used the money from the sale of the parties' marital home to purchase the apartment in Colombia. Tr. 266:9-25; Tr. 267:1-8.

26. Respondent is the listed owner of the apartment that her mother lives in Itaqui, Colombia. Tr. 267:11-25; Tr. 268:1-3.

27. Respondent is also the listed owner of a farm outside of Medellin, Colombia. Tr. 268:4-6.

28. Respondent does not own any property in the United States. Tr: 268:19-21.

29. In May 2023, the parties were referred to Elizabeth Gomez, a family therapist, to assist them in co-parenting their child. Tr. 8:2-6.

**C.    L.C.'s Life in Colombia**

30. In August 2023, the Child was baptized in Colombia. Tr. 87:8-10.

31. The Child is covered under Petitioner's Colombian health insurance from November 2021 until November 2025. PX21, Bates No. SC000100. *See also* Tr. 74:3-7.

32. The Child received medical care in Colombia. Tr. 79:15-17.

33. He was last seen by his pediatrician in Colombia on January 24, 2024. PX8, Bates No. SC000046. *See also* Tr. 80:9-12.

34. The Child participated in extra-curricular activities in Colombia, such as horseback riding lessons, swimming lessons, bike riding lessons, and soccer. PX4, Bates No. SC000022-26; Tr. 79: 9-11; Tr. 82:1-3.

35. The Child had play dates with his friends in Colombia. Tr. 88:25; Tr. 89:1-7.

36. The Child attended Cascanueces in El Carmen, Colombia, from March 2022 through August 2022. Tr. 80:16-23. *See also* PX4, Bates No. SC000009.

37. Thereafter, the Child attended Semillas del Futuro in Itaqui, Colombia, from January 2023 until November 2023. Tr. 81:5-10; Tr. 223. *See also* PX4, Bates No. SC000010-21.

38. As of January 2024, the Child only spoke Spanish. Tr. 89:18-20.

**D.    Discussions Surrounding L.C.'s Move to the United States**

39. In or around June 2023, Respondent told Petitioner that she wanted to move back to the United States. Tr. 89:21-25; Tr. 90:1-2.

40. In November 2023, the parties began discussing this idea with their family therapist, Elizabeth Gomez. Tr. 9:21-25; Tr. 10:1-8.

41. On November 22, 2023, Petitioner sent Respondent a voice message asking her: "What are we going to do? Who is going to take care of him? Do you have a house? All that kind of things, so I would like us to make all that very clear before there is an exact date." RXL, Page 1.

42. That same day, Petitioner sent Respondent another voice message that said: "I just, as a dad, as the other parent, want to know how he's going to be, where he's going to be it seems to me the most normal thing, the fairest thing, and that we both agree." RXN, Page 1.

43. The parties continued to discuss Respondent's and L.C.'s potential move to the United States with Ms. Gomez. Tr. 217:21-23.

44. During these discussions with Ms. Gomez, the parties discussed certain conditions regarding the move to the United States. Tr. 21:20-25; Tr. 22:1-22. Tr. 24:23-25; Tr. 25:1.

45. Ms. Gomez testified to the following conditions discussed by the parties:

"Sebastian was to travel regularly to spend time with L.C., where he would be -- he would be meeting the person who would be providing childcare for the child -- we had proposed a telephone call, a video call -- so that we could meet the person once she secured a job; **that he was not to reside in the United States permanently**; and that Juliana was to seek employment; and **that L.C. was to travel to Colombia**

- 9 -

**on a certain specific date to see his father.** Agreements of a financial context, so financial agreements about the amount of money that Sebastian would pay to Juliana as child support; that there would be consistent and constant conversations on the telephone and video calls as well; and the last conversation was that the child was not to reside permanently in the United States, it was only for Juliana to assess her employment situation but that the child was not to reside permanently in the United States."

Tr. 22:7-22 (emphasis added).

46. Petitioner testified that the conditions for the move were as follows:

"After several sessions, we decided it **would be exclusively to Orlando**. We said I should know where my son, we should know where my son will be living, and who he or they would be living with, I would have a daily video call with him, and that Juliana would appreciate communication between my and L.C. because she's the only one that could do that. We would see how L.C. was adapting, if he was doing well mentally, physically, and emotionally, that she would get a -- she was going to get a job, she would get a place to live with L.C., that I would visit him in the U.S., and that **he would visit us in Colombia**, and that he should live according to the same living standards he was living under in Colombia."

Tr. 91:2-24 (emphasis added).

47. Respondent agreed to Petitioner's conditions in the joint sessions with her. Tr. 25:2-4; Tr. 9-11.

**E.    L.C.'s Departure to the United States in January 2024**

48. On January 6, 2024, Petitioner registered the Child as a Colombian citizen. Tr. 130:8.

49. On January 12, 2024, the Child's Colombian passport was issued. PX3, Bates No. SC000006.

50. Petitioner testified that he obtained Colombian citizenship for L.C. because it would "give [him] more control over L.C., knowing when he will [leave] the country and come back to the country." Tr. 100:2-3.

51. Respondent testified that Petitioner has the authority to place a travel restriction on L.C. at the airport via the Colombian authorities (Tr. 303:2-5) and has previously done so. Tr. 302:13-17.

52. On January 23, 2024, pursuant to the provisions of Colombian Law, namely, Article 110 of the "Code of Childhood and Adolescence" (PX7, Bates No. SC000042), Petitioner executed a travel authorization form which permitted the Child to be outside of Colombia only from January 26, 2024, to May 15, 2024. *Id.* Tr. 306:5-25.

53. Petitioner testified that signing the travel authorization form gave him reassurance that L.C. would return to Colombia. Tr. 100:25; Tr. 101:1-3.

54. On the authorization form, Petitioner described the purpose of the trip was for "tourism." Tr. 99:6-9; Tr. 154:16-18; Tr. 155:12-15.

55. Petitioner testified that it most closely aligned with the exploratory and temporary nature of the move. PX7, Bates No. SC000042. *See also* Tr. 99:6-9; Tr. 155:5-15; Tr. 98:22-25; Tr. 98:1.

56. The travel authorization form required the Child to return on May 15, 2024. PX7, Bates No. SC000042.

57. Petitioner testified that was because he did not consent to the Child's permanent relocation to the United States at that time. *Id. See also* Tr. 51:2-16; Tr. 99:13-18; Tr. 306:5-15.

58. Respondent requested that Petitioner put an indefinite time period in the travel authorization form, but Petitioner refused. PX7, Bates No. SC000042. *See also* Tr. 307:11-15.

59. On January 26, 2024, Respondent left Colombia and traveled to Orlando, Florida, with the Child. Tr. 97:19-20; Tr. 227:1-3; Tr. 274:16-17.

60. The Petitioner visited the Child in Florida in March and April 2024. Tr. 238:15.

61. In March 2024, Petitioner travelled with his mother, his girlfriend and his girlfriend's daughter and they stayed with L.C. for about a week. Tr. 238:17-20.

62. Similarly, in April 2024, Petitioner visited the Child for approximately a week. Tr. 238:23-24.

####     F.     The Move to the United States was Temporary and Conditional

63. Ms. Gomez testified that the trip to the United States beginning in January 2024 was to be temporary and it was not a permanent relocation. Tr. 54:24-25; Tr. 55:1.

64. A mutual friend of the parties, Jenny Gallego, also testified that the move was temporary and not permanent.  Tr. 180:14-25; Tr. 181.

65. Upon their arrival in Florida, Respondent and the Child moved in with Respondent's cousin and her husband in Kissimmee, Florida. Tr. 227. RXB-1, RXB-2, RXB-3, RXB-4, RXB-5, RXB-6.

66. Ms. Escobar resided with her cousin for the duration of their stay in Florida. Tr. 227:4-6.

67. Respondent and the Child shared a room. Tr. 106:8-14; Tr. 227:16-22.

68. The Child was enrolled in day care. Tr. 107:9-10; Tr. 228:21-25; Tr. 229:1; Tr. 229:5-16; Tr. 278:1-2.

69. The Child was having difficulties acclimating to his new environment, including having tantrums and getting angry. Tr. 13:4-9.

70. Respondent was unemployed for the entirety of their stay in Florida. Tr. 228:3-14; Tr. 229:1-4.

71. While in Florida, in February 2024, Respondent asked Petitioner to maintain her health insurance coverage in Colombia. Tr. 268:22-25; Tr. 269:1-6.

72. Respondent's health insurance coverage continued in Colombia until November 2024. PX6, Bates No. SC000039.

73. In line with the parties' agreement that the Child would reside in Orlando, on February 18, 2024, Respondent texted Petitioner "I am here for L.C. to live better and to be closer to Colombia. For me, I would be in New York and earning more money." Tr. 281:19-25.

- 12 -

### G.    Respondent's Move to New York

74. However, on May 4, 2024, Respondent and the Child traveled to New York. Tr. 255:8-9; Tr. 278:14-15.

75. Respondent told Petitioner that she was travelling to New York because she was visiting her mother who was undergoing surgery there. Tr. 105: 1-2; Tr. 278:10-15.

76. Respondent had developed an intention to remain in New York. Tr. 278:16-18.

77. On May 6, 2024, Petitioner text Respondent that she was planning on remaining in New York with L.C. Tr. 105:3-4; Tr. 278:19-23.

78. Upon discovering that Respondent had relocated to New York with the Child, in direct contravention of their agreement, on May 6, 2024, Petitioner wrote Respondent stating: "You're making unilateral decisions that you wouldn't like me to make." Tr. 297:23-25; Tr. 279.

79. On April 28, 2024, the parties had already purchased tickets for Respondent and the Child to fly from Orlando, Florida, to Medellin, Colombia on May 16, 2024 (PX9, Bates No. SC000055. Tr. 285:22-23) in line with their prior agreement that the Child would travel back to Colombia in May 2024. Tr. 59: 23-25; Tr. 60:7.

80. In May 2024, Respondent told a mutual friend, Ms. Gallego, that L.C. would be attending Ms. Gallego's son's birthday party in Colombia. Tr. 182:20-25; Tr. 183:1-12. The birthday party was on May 20, 2024. Tr. 182:25; Tr. 183:1.

81. Then on May 12, 2024, Respondent changed her mind and told Ms. Gallego that L.C. was not going to travel to Colombia. Tr. 183:2-9.

82. Similarly, on May 14, 2024, Respondent messaged the Petitioner that L.C. was not going to travel to Colombia as planned and as agreed. Tr. 104:5-7.

83. That same day, Respondent also messaged Petitioner seemingly recognizing their prior agreement: "I'm willing to honor the agreements as soon as we have everything settled with the court." Tr. 295:12-17.

84. On May 15, 2024, Petitioner asked Ms. Gomez for an emergency session because Respondent "did not comply with the agreement of bringing the child home." Tr. 55:12-13; Tr 55:21-25.

85. Respondent and the Child did not return to Colombia on May 16, 2024. Tr. 103:21-22.

86. On May 17, 2024, the parties had their last joint session with Ms. Gomez. Tr. 55:4-18; Tr. 46: 7-18.

87. On May 26, 2024, Petitioner, disappointed that Respondent had not met her end of the agreement (Tr. 105: 2-23), texted Respondent: "Are you going to let Liam come to Colombia?" RXCC, Page 24.

88. Respondent acknowledged that if she returned the Child to Colombia, she would need to obtain Petitioner's further consent for L.C. to return to the United States as he had been registered as a Colombian citizen. Tr. 104:12-14; Tr. 248:20-24.

89. Respondent expressed to Ms. Gomez that she feared that L.C. "would not be allowed to go back to the United States." Tr. 59:5-9.

90. On June 17, 2024, Petitioner reiterated that he did not give Respondent permission for L.C. to live in New York. Tr. 296:1-15.

91. On July 11, 2024, Petitioner referenced Respondent's violations of their agreement writing that: "It seems to me that you have not fulfilled what you told me regarding L.C. You have made unilateral decisions." Tr. 303:6-15.

92. On August 22, 2024, Petitioner again, referencing the parties' prior agreements, texted Respondent: "I let him come here and you and I had an agreement. That he would go on vacation

- 14 -

to Colombia, where the whole family waits for him and loves him. That it was Florida. None of that was fulfilled. And I am not telling you because of threats or anything, they are just facts." RXTT, Page 33. Tr. 305:9-20.

### H. The Wrongful Retention of L.C. in New York

93. Respondent and the Child first moved in with Respondent's step-father in Fresh Meadows, New York. Tr. 281:5-7; Tr. 330:8-9.

94. It was the first time L.C. had ever met Respondent's step-father. Tr. 281:8-10.

95. At least for the month of May, Respondent was not working, and the Child did not attend any day care or school, nor was he enrolled in extra-curricular activities. Tr. 281:11-18.

96. Thereafter, in June 2024, Respondent and the Child moved to a new address in Queens. Tr. 292:12-16; Tr. 109:1-9.

97. Respondent refused to disclose her new address to Petitioner because she feared that Petitioner would pick up L.C. and take him to Colombia without her permission. Tr. 109:12-25; Tr. 110:1-5; Tr. 292:17-25; Tr. 293:1-2.

### I. Procedural History

98. On November 15, 2024, Petitioner filed his Verified Petition for The Return of Child to Colombia alleging that the Child was wrongfully retained from Colombia to the Eastern District of New York. ECF No. 1.

99. On December 24, 2024, Respondent filed her Answer, in which she challenged Petitioner's *prima facie* case and raised the affirmative defense of consent under the Hague Convention. ECF No. 14.

100.    On February 24 and 26, 2025, this Court conducted a bench trial, during which the parties were afforded the opportunity to be heard, examine and cross-examine witnesses, present evidence bearing on the issues, and argue the law and evidence.

## II.   PROPOSED CONCLUSIONS OF LAW

A.   The Hague Convention Framework

101.    Petitioner's Verified Petition is filed pursuant to the Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980[2] (hereinafter the "Hague Convention" or "Convention"), and the International Child Abduction Remedies Act (hereinafter "ICARA") 22 U.S.C. § 9001 *et seq.*

102.    The Convention came into effect in the United States on July 1, 1988, and was ratified between the United States and Colombia on June 1, 1996.

103.    The objects of the Convention are as follows: (1) to secure the immediate return of children wrongfully removed or wrongfully removed in any Contracting State; and (2) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States.  Hague Convention, Art. 1.

104.    The Hague Convention applies to cases in which one parent wrongfully removes or retains her or his child, who is under the age of 16 years, from the child's "habitual residence" in breach of the other parent's custodial rights, which were being exercised at the time of the wrongful retention of the child. Hague Convention, Art. 3.

105.    The Hague Convention "was adopted in 1980 in response to the problem of international Child abductions during domestic disputes." *Golan v. Saada,* 596 U.S. 666, 670 (2022) (*quoting Abbott v. Abbott*, 560 U.S. 1, 8 (2010)).

106.    The Convention's purpose is:

> to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access.

---

[2] T.I.A.S. No. 11,670 at 1, 22514 U.N.T.S. at 98, *reprinted in* 51 Fed. Reg. 10493 (1986).

Hague Convention, pmbl.

107.    "The Convention's core premise is that the interests of children in matters relating to their custody are best served when custody decisions are made in the child's country of habitual residence." *Golan*, 596 U.S. at 670 (internal quotation marks omitted).

108.    To further this principle, the Convention "generally requires the prompt return of a child to the child's country of habitual residence when the child has been wrongfully removed to or retained in another country." *Id.* (citing Hague Convention, Arts. 1(a), 12).

109.    To implement the Convention, Congress enacted the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001-11, in 1988.

110. Pursuant to ICARA,

[a]ny person seeking to initiate judicial proceedings under the Convention for the return of a child ... may do so by commencing a civil action by filing a petition for the relief sought in any court ... which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed.

22 U.S.C. § 9003(b).

111.    United States District Court, Eastern District of New York has jurisdiction pursuant to 22 U.S.C. § 9003(a) (jurisdiction under the Hague Convention) and 28 U.S.C. § 1331 (federal question jurisdiction).

112.    In adjudicating a Hague Convention petition, "[t]he court in which [the] action is brought .... [must] decide the case in accordance with the Convention." *Id.* § 9003(d).

113.    To that end, the court must "determine only [the parties'] rights under the Convention and not the merits of any underlying child custody claims." *Id.* § 9001(b)(4); *See also* Hague Convention, Art. 19 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue.").

114.     Under ICARA, the party petitioning for the Child's return bears the burden of establishing by a preponderance of the evidence that the Child was wrongfully removed or retained. 22 U.S.C. § 9003(e)(1).

115.     To establish his *prima facie* case, petitioner must demonstrate, by a preponderance of the evidence, that:

> (1) the child was habitually resident in one State and has been removed to or retained in a different State;
> (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and
> (3) the petitioner was exercising those rights at the time of the removal or retention.

*Marks v. Hochhauser*, 876 F.3d 416, 418-19 (2d Cir. 2017) (citations omitted).

116.     Respondent contests the first prong of Petitioner's *prima facie* case, which is whether Colombia was L.C.'s habitual residence at the time of the wrongful retention. ECF No. 14; *See also* Tr. 370:18-24; Tr. 371:1-4.

117.     Petitioner claims that L.C.'s habitual residence was Colombia as of May 16, 2024, while the Respondent claims that it was the United States. ECF No. 14.

118.     During closing argument Respondent stated that he did not contest that Petitioner has rights of custody over the Child under Colombian law but did not stipulate to that in the joint proposed findings of fact and conclusions of law. *See* Hague Convention Art. 3(a); Tr. 370:18-24[3].

119.     Respondent did not contest that Petitioner was exercising his custodial rights at the time of the alleged wrongful retention in May of 2024. *See* Hague Convention Art. 3(b) and Art. 13(a); Tr. 371:1-4. *See also* ECF No. 14.

---

[3]     To the extent Petitioner must establish this prong of his *prima facie* case, it is addressed in Section B.

B.    Petitioner Has Established a *Prima Facie* Case Under the Hague Convention

120.    The totality of the circumstances establish that Colombia was the Child's habitual residence at the time of the wrongful retention on May 16, 2024. *Monasky*, 589 U.S. at 81.

121.    Petitioner has rights of custody over the Child under Colombian law. ECF No. 1, Para. 40-41.

122.    Fed. R. Civ. P. 44.1, which governs determinations of foreign law, permits a Petitioner to establish foreign law through their pleading: "In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." *See also Sabogal v. Velarde*, 106 F. Supp. 3d 689, 700 n.4 (D. Md. 2015) (foreign law established in part through petition).

123.    Courts may take judicial notice of the law of the country of the child's habitual residence without following standard procedures for the proof of foreign law. *See* Hague Convention, Art. 14.

124.    The right of *patria potestas* or "parental authority" under Colombian law arise from XIV of the Colombian Civil Code.  Title XII of the Colombian Civil Code further sets forth the rights and duties between parents and children. Article 253 of the Civil Code provides that "[b]oth parents ... shall exercise the parental care in the upbringing and education of their legitimate children." *Aguirre v. Calle*, No. 08 CV 2613 SJ/SMG, 2008 WL 4461931 at *5 (E.D.N.Y. Oct. 3, 2008) *citing Garcia v. Angarita*, 440 F.Supp.2d 1364, 1375 (S.D. Fla. 2006).

125.    Article 288 of the Civil Code provides that "[p]aternal authority is the set of rights that the law acknowledges to the parents over their non-emancipated children ...." It further provides that, "[t]he exercise of the parental authority over their legitimate children shall be exercised jointly by both parents. In the absence of one of the parents, the other parent shall exercise the paternal authority." *Id.*

126.     Moreover, Article 110 of the Law 1098 of 2006 Childhood and Adolescence Code provides that when a child or adolescent residing in Colombia is to travel abroad with one parent or with a person other than their legal representative, prior authorization must be obtained from the accompanying parent, duly authenticated before a notary or consular authority. Said permission must contain the place of destination, the purpose of the trip and the date of departure and re-entry to the country.[4]

127.     Petitioner was exercising his rights of custody at the time of the wrongful retention. *See Friedrich v. Friedrich*, 78 F.3d. 1060, 1066 (6th Cir. 1996) (a "person cannot fail to 'exercise' custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child.")

128.     Respondent's refusal to return L.C. to Colombia on May 16, 2024, in clear violation of the parties' agreement, "contravened Petitioner's custodial rights protected by the Hague Convention." *Saavedra v. Montoya,* No. 21-CV-5418(EK)(VMS), 2023 WL 2910654, at *14 (E.D.N.Y. Apr. 12, 2023), *appeal withdrawn*, No. 23-694, 2023 WL 5600054 (2d Cir. Aug. 4, 2023) (internal citations omitted) (concluding that overstaying a Colombian travel authorization when the child is a habitual resident of Colombia constitutes wrongful retention).

129.     The retention of L.C. was wrongful under the Hague Convention because L.C.'s habitual residence is Colombia, and overstaying the travel authorization breached Petitioner's rights of custody pursuant to Colombian law. *See* Hague Convention, Art. 3.

---

[4]     *See also  Aguirre v. Calle*, No. 08 CV 2613 SJ/SMG, 2008 WL 4461931 at *5 (E.D.N.Y. Oct. 3, 2008) citing *Garcia v. Angarita*, 440 F.Supp.2d 1364, 1375 (S.D.Fla.2006) *("*Article 338 of the Colombian Minors' Code provides that, "[w]hen a minor is going to go out of the country with one of the parents or with a person different from their legal representatives, they should previously obtain the permission of the parent or legal representative who is not traveling, authenticated before a notary or consular authority.") This law has since been repealed; however, its principle is now embodied in Article 110 of Law 1098 of 2006 Childhood and Adolescence Code.

### i.    The Date of Wrongful Retention is May 16, 2024

130.    A primary issue in this case is habitual residence, which is determined as of the date of retention. *See* Hague Convention, Art. 3; *Didon v. Castillo*, 838 F.3d 313, 320 (3d Cir. 2016) (considering wrongful retention when "[respondent] permitted [petitioner] to travel to the United States with the children").

131.    The date of a Child's retention "is the date beyond which the noncustodial parent no longer consents to the Child's continued habitation with the custodial parent and instead seeks to reassert custody rights, as clearly and unequivocally communicated through words, actions, or some combination thereof." *Blackledge v. Blackledge*, 866 F.3d 169, 179 (3d Cir. 2017).

132.    In *Swett v. Bowe*, 733 F. Supp. 3d 225, 255 (S.D.N.Y.), the petitioner had executed a travel authorization form that permitted the child to travel with Respondent from Chile to the United States until January 8, 2023. The district court determined that the date of wrongful retention occurred when the travel authorization expired, regardless of the parties' prior agreement and discussions regarding a longer travel plan. The court found that even if the father disagreed with the return date and he expected a longer stay, per the parties' prior agreement, January 8, 2023 was still found to be the wrongful retention date. *Id*. at 279. On appeal, the Second Circuit found that the district court correctly found that respondent's wrongful retention of the child occurred on January 8, 2023, the child's return date to Chile pursuant to the travel authorization form. *Urquieta v. Bowe*, 120 F.4th 335, 338 (2d Cir. 2024).

133.    The date of wrongful retention is May 16, 2024, as the Petitioner authorized for the Child to reside in the United States until May 15, 2024, but purchased the Child's return flights to Colombia for May 16, 2024. PX7, Bates No. SC000042 and PX9, Bates No. SC000055. *Chechel v. Brignol*, No. 510-CV-164-OC-10GRJ, 2010 WL 2510391 (M.D. Fla. June 21, 2010) (finding

where there is an agreement to travel, wrongful retention begins when the agreed date of return passes).

### ii.    L.C.'s Habitual Residence on May 16, 2024 was Colombia

134.    The salient inquiry before this Court is whether New York or Colombia was the Child's habitual residence in May 2024. *See Matter of E.Z.*, No. 1:21-CV-06524-MKV, 2021 WL 5106637, at *2 (S.D.N.Y. Nov. 2, 2021) ("Under the Convention, a "State" refers to a Country except that "[i]n relation to a State which in matters of custody of children has two or more systems of law applicable in different territorial units ... any reference to habitual residence in that State shall be construed as referring to habitual residence in a territorial unit of that State." *See* Hague Convention Art. 31. As such, the relevant focus in the Court's inquiry of the children's habitual residence is New York vs. Iceland, not the United States vs. Iceland").

135.    Though the Convention provides no strict definition of "habitual residence," the Supreme Court in *Monasky v. Taglieri,* 589 U.S. 68 (2020) set out a holistic standard, where a "child's habitual residence depends on the totality of the circumstances specific to the case." *Monasky*, 589 U.S. at 71.

136.    While no signal fact is dispositive, a district court should consider the intentions of the parents (especially when the children are "too young and unable to acclimate") and acclimatization (for older children). *Id.*

137.    The Court heard testimony confirming that L.C. had lived in Colombia from December 2021 to January 2024. Tr. 69:18-25; Tr. 202:18-19; Tr. 274:16-17.

138.    Respondent has stipulated that the Child's habitual residence was Colombia prior to January 2024. Tr. 367:23-25; Tr. 368:1-3.

139.    The Child is a dual citizen of Colombia and the United States. PX2, Bates No. SC000004.

140.    Spanish is the Child's primary language and as of January 2024, he only spoke Spanish. Tr. 89:18-20.

141.    Nearly all of the Child's extended family live in Colombia. 02/24/25 Tr. 76. *Monasky*, 589 U.S. at 81.

142.    L.C. maintains substantial connections to Colombia. He is still covered by Petitioner's Colombian health insurance. PX21, Bates No. SC000100. *See also* Tr. 74:3-7.

143.    He also received medical care in Colombia (Tr. 79:15-17) and was last seen by his pediatrician in Colombia on January 24, 2024. PX8, Bates No. SC000046. *See also* Tr. 80:9-12. *Monasky*, 589 U.S. at 81.

144.    The Child attended Cascanueces in El Carmen, Colombia, from March 2022 (Tr. 80:16-23) to August 2022. Tr. 81:5-10; Tr. 223.

145.    Thereafter, the Child attended Semillas del Futuro in Itaqui, Colombia, from January 2023 until November 2023. Tr. 81:5-10; Tr. 223. *See also* PX4, Bates No. SC000010-21.

146.    The Child had frequent play dates with his friends in Colombia. Tr. 88:25; Tr. 89:1-7.

147.    He also participated in numerous extra-curricular activities in Colombia, such as horseback riding lessons, swimming lessons, bike riding lessons, and soccer. PX4, Bates No. SC000022-26; Tr. 79:9-11; Tr. 82:1-3. *Monasky*, 589 U.S. at 81.

148.    These findings as a whole support a finding that immediately before May 16, 2024 – the date of the wrongful retention – L.C.'s habitual residence was Colombia. *Monasky*, 589 U.S. at 77. ("The place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence.").

iii.    **The Parties Did Not Have a Shared Intent to Shift L.C.'s Habitual Residence to The United States**

149.    If the Court determines that the relevant inquiry is whether Colombia or the United States is L.C.'s habitual residence, that should not change the outcome.

150.    In determining a child's habitual residence, courts "inquire into the shared intent of those entitled to fix the child's residence (usually the parents) at the latest time that their intent was shared, considering both actions and declarations." *Tereshchenko v. Karimi*, No. 23CV2006 (DLC), 2024 WL 80427, at *3 (S.D.N.Y. Jan. 8, 2024), aff'd in part and remanded, 102 F.4th 111 (2d Cir. 2024) (*citing Saada v. Golan*, 930 F.3d 533, 539 (2d Cir. 2019) (citation omitted)).

151.    Two factors have commonly been cited as particularly relevant to determining habitual residence: "the shared intent of those entitled to fix the child's residence (usually the parents) at the latest time that their intent was shared," and "whether the evidence unequivocally points to the conclusion that the child has acclimatized" to a particular location. *Poix v. Susibel Altagracia Espaillat Santana*, No. 22 CIV. 4980 (JPC), 2022 WL 9847347, at *6 (S.D.N.Y. Oct. 17, 2022) (*citing Gitter v. Gitter*, 396 F.3d 124 (2d Cir. 2005)).

152.    In some more difficult cases, those factors may weigh in different directions—for example, if at the time of removal a child had become acclimatized to living in one country even though his parents did not intend for that country to become his permanent home. *Id.* (*citing Gitter*, 396 F.3d at 135-36)(instructing the district court to consider "whether the circumstances in which [the child] lived in Israel support a finding that his habitual residence changed from the United States to Israel, or whether his parents' last shared intent that his habitual residence be in the United States should control").

153.    Without evidence of a "settled mutual intent" to change a child's habitual residence, courts have historically refused to find such change. *Ermini v. Vittori*, 758 F.3d 153, 159

- 24 -

(2d Cir. 2014) ("The court found that the children's habitual residence was Italy, since there was no shared, settled intent among the parents to change permanently the children's habitual residence to the United States").

154.    In examining the objective facts surrounding the parties move, the parties did not share a mutual, settled intent to shift L.C.'s habitual residence from Colombia to the United States. Even if Respondent intended to permanently relocate, Petitioner had a different expectation of the move. Had Petitioner truly formed a settled intent to permit L.C.'s permanent move to the United States, he would have taken measures consistent with that desire – *i.e.,* granting an indefinite travel authorization. PX7, Bates No. SC000042. *See also* Tr. 98:22-25; Tr. 99:1.

155.    In *Prinz v. Faso*, 03–CV–6653, 2004 WL 1071761, at *5 (W.D.N.Y. May 12, 2004), the district court found that one of the reasons the parties did not have shared intent regarding their child's habitual residence is that they arrived into the foreign country with "very different intentions and expectations": "while [petitioner] may have understood the relocation to Germany to be permanent, or at least indefinite, [respondent] believed that the parties had agreed that if either family member was unhappy in Germany, the family could and would return to the United States."

156.    In this instant action, similarly, the parties offered distinct versions of the purpose of L.C.'s move to the United States. From Petitioner's perspective, it was temporary for a trial period while Respondent explored possibilities in Florida. Tr. 99:6-9; Tr. 155:2-25; Tr. 98:22-25; Tr. 99:1. Respondent, on the other hand, purports that the move was supposed to be indefinite if not permanent. Tr. 218:18-23; Tr. 207:1-6.

157.    Respondent's intention alone cannot shift L.C.'s habitual residence. *See Nicolson v. Pappalardo*, 605 F.3d 100, 105 (1st Cir.2010) ("Standing alone, of course, the mother's intent

that the child[ren] should one day live in the United States could not support a finding of habitual residence." (internal quotation marks and alteration omitted))

     **iv.    The Move to the United States was Temporary, Conditional and on a Trial Basis**

158.    When examining the shared intent of the parents, courts ask not only whether both parents "mutually intended" to make a country their children's habitual residence, but also whether there was "conditional intention." *Ermini*, 758 F.3d at 162; *See also Mota v. Castillo*, 692 F.3d 108, 115 (2d Cir. 2012); *Maxwell v. Maxwell*, 588 F.3d 245, 251-52 (4th Cir. 2009) ("[c]ourts have refused to find a change in habitual residence when one parent intended to move to the new country of residence on a trial or conditional basis.")

159.    The record clearly establishes that the move was temporary, conditional, and on a trial basis. First, the move was temporary as the Child was scheduled to return to Colombia in mid-May 2024. PX7:SC000042. The move was additionally conditioned and on a trial basis for Respondent to explore different opportunities in Florida and for Petitioner to be satisfied with the Child's quality of life in Florida. Tr. 91:18-24. Additional conditions included that the Child remain living in Florida, and that the Child returned to Colombia as scheduled. Tr. 100:14-19; Tr. 22:6-22.

160.    Ms. Escobar Restrepo's subsequent move from Florida to New York and refusal to return the Child to Colombia in May 2024 (PX7, Bates No. SC000042) are clear examples of her violating her conditions and the parties' agreement. This, in and of itself, precludes a finding that the Child's habitual residence shifted from Colombia to the United States. *Calixto v. Lesmes*, 909 F.3d 1079, 1089-90 (11th Cir. 2018) (holding, when "a parent's relocation with a child from one country to another [is] conditioned upon the occurrence of certain events, [ ] the first country [ ] remain[s] the child's habitual residence if those events did not come to pass").

161.     Additionally, regardless of any unsatisfied explicit conditions, the move to the United States was further conditioned on Petitioner's satisfaction with the Child's quality of life in Florida. Tr. 91:18-24.

162.     In *Gitter v. Gitter*, 396 F.3d 124 (2d Cir. 2005), the Second Circuit affirmed the district court's finding of no shared intent because "Mr. and Mrs. Gitter 'only mutually agreed to move to Israel on a conditional basis-namely, that Mrs. Gitter would be satisfied with the new arrangements'"). *Id* at 135.

163.     Similarly, in this instant action, Petitioner was not satisfied with the Child's arrangements in the United States and therefore the parties did not have a settled mutual intention in making the United States the Child's permanent home. *Id.*

164.     This is separate and apart from Respondent's failure to comply with the conditions set forth for the move, i.e. the Child remaining in Florida (Tr. 91:13; Tr. 117:6), returning the Child to Colombia (Tr. 22:13-14; Tr. 91:22), that the Child would be well mentally and physically (Tr. 91:19-20), and that Petitioner would have unfettered access to the Child. Tr. 91:15-16. The move was temporary until May 2024, at which time the Child was to be returned to Colombia for the Petitioner to assess the Child's quality of life in the United States and whether the conditions were satisfied for settling on any future intentions regarding a more permanent move. *Calixto v. Lesmes*, 909 F.3d 1079, 1089-90 (11th Cir. 2018) (holding, when "a parent's relocation with a child from one country to another [is] conditioned upon the occurrence of certain events, [ ] the first country [ ] remain[s] the child's habitual residence if those events did not come to pass").

165.     Thus, this Court ought to find that Petitioner did not act consistent with a shared intent to abandon the Child's habitual residence and alter it to New York, despite having agreed for the Child to temporarily reside in Florida, because his intent was subject to the condition that

he was satisfied that Respondent was meeting her end of their agreement. *Berezowsky v. Ojeda*, 765 F.3d 456, 467 (5th Cir. 2014) ("The mere fact that the parents have consented for the child to move to a new country does not prove that they share the necessary intent to make that new location the child's habitual residence").

### v.    The Child Did Not Acclimatize to Life in the United States

166.    In analyzing whether the child has so acclimated to the new location that they have acquired a new habitual residence, "courts should be 'slow to infer' that the child's acclimatization trumps the parents' shared intent," as applying a low bar to this inquiry would entirely undermine the purpose of the Hague Convention, which is to "dissuade parents and guardians from engaging in gamesmanship with a child's upbringing in order to secure an advantage in an anticipated custody battle." *Gitter*, 396 F. 3d at 134.

167.    Courts are reticent to find that a child acclimatized to a new country during a short period of time. And L.C. was not "physically present for an amount of time sufficient for acclimatization." *Feder v. Evans–Feder*, 63 F.3d 217, 224 (3d Cir.1995) ("courts should be 'slow to infer' that the child's acclimatization trumps the parents' shared intent" because "[p]ermitting evidence of acclimatization to trump evidence of earlier parental agreement could 'open children to harmful manipulation when one parent seeks to foster residential attachments during what was intended to be a temporary visit.'") (*quoting Mozes v. Mozes*, 239 F.3d 1067, 1079 (9th Cir. 2001)).

168.    L.C. being enrolled in day care in Florida and having a few family members in Florida, two factors the Respondent claims led the Child's habitual residence to shift from Colombia to the United States, merely demonstrates that L.C. was taken care of during the day while Respondent sought employment and attended interviews. The time L.C. spent in the United States is not sufficient to overcome the lack of a shared parental intent to shift the Child's habitual residence from Colombia to the United States. *Neiuwenhoven v. Pisani*, No. 5:23-CV-34-GAP-

PRL, 2023 WL 4930852, at *3 (M.D. Fla. Feb. 23, 2023) ("despite testimony from the Respondent and her mother that the Minor Child has attended a school and has engaged in other family and community activities since arriving in Florida seven months ago, there has not been a sufficient passage of time to evidence acclimatization to a new environment").

169.    The connections that L.C. maintained to Colombia also outweigh the fact that he was enrolled in day care and that he lived with a few family members in Florida. *Sundberg v. Bailey*, 293 F. Supp. 3d 548 (W.D.N.C. 2017), aff'd, 765 F. App'x 910 (4th Cir. 2019) is instructive. There, the court found that the child did not acclimatize to the United States despite being enrolled in preschool and having several friends there. *Id* at 557. The court found that Sweden was still the child's habitual residence because she maintained connections to the country, such as being in regular contact with her Swedish family members and being enrolled in the Swedish healthcare system. *Id*. Further, as the child was four, just as L.C. is, the court found that she was "not of an age where [she] is strongly attached to any particular school or social environment." *Id*.

170.    Moreover, a strong factor cutting against the Child's acclimatization in the United States is the fact that he never enjoyed a stable home environment, moving between at least three different homes across two  states. This constant movement can be categorized as being in a "permanent state of flux". Courts have found that the fact that children in a "permanent state of flux" are not acclimatized. *See  Papakosmas  v. Papakosmas*, 483 F.3d 617, 627 (9th Cir. 2007) (court finds child did not acclimatize when child moved three times within four months while living in Greece).

171.    The Child was not "firmly rooted" in the United States and was in a "permanent state of flux" as indicated by the fact that within four months: (1) Respondent and the Child moved from Florida to New York; (2) Respondent was not employed; (3) Child did not attend school consistently until September 2024; (4) Child was not enrolled in any extra-curricular activities; (5)

Child met Respondent's step-father for the first time when they moved in with him; and (6) by May 2024, the Child did not make any friends or meaningful connections in the United States. *Id.* at 628 (Ninth Circuit "agree[ing] with the district court that the four-month period spent by the children in Greece was insufficient to acclimatize them to that country").

172.     Moreover, notably, the Supreme Court has instructed that acclimatization has little importance in cases involving young children, such as L.C. *Monasky*, 589 U.S. at 78 (distinguishing between acclimatization of "older children capable of acclimating to their surroundings" versus children "too young or otherwise unable to acclimate"); *Redmond v. Redmond*, 724 F.3d 729, 746 (7th Cir. 2013) (recognizing that "the concept of acclimatization has little meaning" for young children); *See also Castang v. Kim*, No. 1:22-CV-05136-SCJ, 2023 WL 1927027, at *5 n.5 (N.D. Ga. Feb. 9, 2023), aff'd, No. 23-10426, 2023 WL 3317983 (11th Cir. May 9, 2023) (finding that a four-year-old child was for practical purposes an infant in a habitual residence analysis). *Hiroki v. Hiroki*, 698 F. Supp. 3d 1023, 1034 (N.D. Ohio 2023) (noting for a five-year-old child, court looks to shared intent).

### vi.    The Child Did Not Acclimatize to Life in New York

173.     To the extent that acclimatization to New York is a weighted factor in this case, L.C. has not been so integrated into life in New York during his brief stint there that bringing him back to Colombia would be akin to tearing him away from the environment in which he developed. Such acclimatization "is rarely on display." *Nissim v. Kirsh*, 394 F. Supp. 3d 386, 393 (S.D.N.Y. 2019) (citations omitted).

174.     In other words, a finding that L.C. was acclimatized would entail the determination that he became so "at home" in New York during the few weeks that he lived there that now returning to live in Colombia, where he spent the majority of his life, is harmful. This is simply not the case. *See Mota*, 692 F.3d at 116 ("It would frustrate the objectives of the Convention

if a parent or guardian could secure an advantage in an anticipated custody dispute merely by whisking the child away to a foreign land and retaining her there long enough to amass evidence of the child's acclimatization to the new location.") (citing *Gitter*, 396 F.3d at 134).

175.    By May 16, 2024, the Child had only been in New York for two weeks and he did not have a stable environment (Tr. 104:22-25), demonstrating that the Child was clearly not "at home" in New York. *Monasky*, 589 U.S. at 81.

176.    Further, "a child's residence in a particular country can only be considered 'habitual' when 'her residence there is more than transitory'" and requires "some degree of integration by the child in a social and family environment." *Douglas v. Douglas*, 2021 WL 4286555, at *4 (6th Cir. Sept. 21, 2021) (quoting *Monasky*, 589 U.S. at 76).

177.    Respondent has acknowledged in her own testimony that in the month of May, she was not working, and the Child did not attend any day care or school, nor was he enrolled in extra-curricular activities. Tr. 281:11-18.

178.    Respondent also admitted at trial that L.C. met her step-father for the first time when they moved in with him in May 2024. Tr. 281:8-10.

179.    Under the "totality of the circumstances" rubric outlined in *Monasky*, the Child was not habitually resident in the United States when he was wrongfully retained by Respondent on May 16, 2024.

C.    Affirmative Defense of Consent

180.    "Where a petitioner has made out *a prima facie* case for his child's return, the respondent can prevent the repatriation of the child if she is able to establish that "one of the narrow exceptions set forth in the Convention applies." " 22 U.S.C. § 9001(a)(4); *See also Id.* § 9003(e)(2). *Mene v. Sokola*, No. 22 CIV. 10333 (KPF), 2024 WL 4227788 at *6 (S.D.N.Y. Sept. 17, 2024).

181.    Article 13 of the Convention provides that "the judicial or administrative authority of the requested State is not bound to order the return of the child if ... the person ... having care of the person of the child ... consented to or subsequently acquiesced in the removal or retention." *See* Hague Convention, Art. 13(a); 22 U.S.C. § 9003(e)(2)(B).

*182.*    "A respondent raising the consent or acquiescence exception must show by a preponderance of the evidence that the petitioner "consented to or subsequently acquiesced in the removal or retention." *Id.*

### i.    The Court Does Not Have to Advance Respondent's Consent Inquiry

183.    The Court need not proceed with the consent inquiry, as Petitioner has demonstrated by a preponderance of the evidence that the retention of L.C. in New York beyond the date specified in the executed travel authorization form constitutes a *de facto* wrongful retention.

184.    First, Petitioner possesses a *ne exeat* right which the U.S. Supreme Court in *Abbott v. Abbott*, 130 S. Ct. 1983 (2010), has declared a "right of custody" within the meaning of the Hague Convention. *Id*. at 1990.  In *Abbott*, the Court found that, where the law of the country of residence explicitly requires a parent to give consent before removing the child, a custodial right exists. *Id*. at 1999.

185.    Secondly, pursuant to Colombian law, Petitioner held the authority to grant limited permission for the Child's travel outside of the country for a specified duration, which he did by executing the travel authorization form in January 2024. By executing the authorization form, Petitioner was assured that L.C. would return to Colombia. Tr. 100:25; Tr. 101:1-3. *See also* PX7, Bates No. SC000042.

186.    Lastly, an abducting parent's failure to comply with the terms of a travel authorization pursuant to the habitual residence's statutory *ne exeat* rights has been found

"wrongful" pursuant to the Convention. *Valles Rubio v. Veintimilla Castro*, No. 19-CV-2524(KAM)(ST), 2019 WL 5189011 at *17 (E.D.N.Y. Oct. 15, 2019), aff'd, 813 F. App'x 619 (2d Cir. 2020) (citing *In re R.V.B.*, 29 F. Supp. 3d 243, 254 (E.D.N.Y. 2014)). Therefore, Respondent's continued stay in the United States beyond the authorized period, in violation of the limited-duration travel authorization that Petitioner purposefully executed prior to L.C.'s departure to the United States, violated Petitioner's *ne exeat* right, and therefore constitutes a *de facto* wrongful retention.

187.    Should the Court proceed with the consent inquiry, it should find that Respondent has failed to establish by a preponderance of the evidence that Petitioner consented to L.C.'s permanent and indefinite relocation to the United States.

> **ii.    Respondent Did Not Establish That Petitioner Consented to L.C.'s Permanent Relocation**

188.    "In examining a consent defense, it is important to consider what the petitioner actually contemplated and agreed to in allowing the child to travel outside its home country. The nature and scope of the petitioner's consent, and any conditions or limitations, should be taken into account." *Baxter v. Baxter*, 423 F.3d 363, 371 (3d Cir. 2005).

189.    Ambiguous statements or actions are insufficient. *Cuellar v. Joyce*, 596 F.3d 505, 512 (9th Cir. 2010). Rather, a statement or action must "unequivocally demonstrate that [the petitioning parent] consented to the child's indefinite stay in [America]." *Asvesta v. Petroutsas*, 580 F.3d 1000, 1019 (9th Cir. 2009).

190.    Respondent has failed to prove by a preponderance of the evidence that Petitioner consented to L.C.'s indefinite retention in the United States prior to Respondent and the Child's departure in January 2024. *In re R.V.B.*, 29 F.Supp.3d 243, 254 (E.D.N.Y.2014) ("In light of the

Court's finding that the Father had 'rights of custody,' the Mother's retention of the Child in New York beyond the period of time consented to by the Father was wrongful").

191.    "The fact that a petitioner initially allows children to travel, and knows their location and how to contact them, does not necessarily constitute consent to removal or retention under the Convention." *Baxter*, 423 F.3d at 371.

192.    Respondent's consent defense fails because she has not shown any evidence that Petitioner agreed to L.C.'s unconditional and permanent relocation to the United States. Instead, the evidence presented at trial demonstrates that Petitioner never consented to such because (1) the executed travel authorization form explicitly limited his consent to L.C.'s travel to a period of four months and (2) although Respondent asked Petitioner to make the permission valid for an unlimited period to reflect a permanent move, Petitioner refused. Tr. 51:2-16; Tr. 99:13-18. *Garcia v. Angarita,* 440 F.Supp.2d 1364, 1380 (S.D.Fla.2006) (holding that the petitioner's agreement to allow his children to travel to the United States for a brief visit did not constitute consent to their relocation).

193.    Petitioner's actions before L.C.'s departure to the United States are inconsistent with consent. Pursuant to Colombian law, Petitioner, as the right holder, executed a travel authorization form that permitted the Child to be outside the country from January 26, 2024, to May 15, 2024. PX7, Bates No. SC000042. *Giampaolo v. Erneta*, 390 F.Supp.2d 1269, 1283 (N.D.Ga. 2004) (refusing to construe a travel authorization as consent because "[t]he very title of the consent letter-'Authorization to Travel'-indicated that the document was intended to authorize *travel,* as opposed to permanent relocation").

194.    Even if Petitioner had put an indefinite time period on the travel authorization form as requested by Respondent, it would still not constitute consent under the Hague Convention. *See also* Tr. 307:11-15. *Moreno v. Martin*, 2 No. 08-22432-CIV, 2008 WL 4716958

at *12 (S.D. Fla., Oct. 23, 2008) (district court finding "that the Permission to Travel does not contain the requisite statement of intent to allow permanent relocation and is, to the contrary, evidence that before [Respondent-Mother] removed [Child] from Spain, [Petitioner-Father] did *not* consent to her permanent relocation outside of Spain.).

195.    The Petitioner utilized the term "tourism" to describe the purpose of the trip on the authorization form, rather than "move," as it was the term that most closely aligned with the Petitioner's understanding of the trip as an "exploratory trip." PX7, Bates No. SC000042. Tr. 99:5-9; Tr. 154:16-21; Tr. 155:5-15. *Moreno,* 2008 WL 4716958 at *12 (affirming that, when consenting to a permanent relocation, "courts understandably require a clear and unequivocal statement of such intent before finding such consent").

196.    In *Soulier v. Matsumoto*, No. CV 20-4720, 2022 WL 2666946 (D.N.J. July 8, 2022), the petitioner agreed for his children to spend the 2018-2019 school year in New Jersey and, if the petitioner could secure permanent employment in New Jersey that year, the family would relocate to the United States. *Id.* at *1. The parties signed a travel authorization form that delineated July 10, 2019 as the date that the children had to return to Brussels. *Id.* at *12. The petitioner "insisted on adding a return date to ensure Respondent returned to Brussels with the children that summer, and he intentionally called the travel a "trip" rather than a "move." *Id.* at n.9. The district court found that while "Petitioner consented to the relocation of the children to the United States…he only did so up until the wrongful retention date of July 10, 2019." *Id.* at *14.

197.    *Soulier* is instructive here. Petitioner agreed for L.C. to temporarily reside in the United States, but he had purposefully placed May 15, 2024, as the Child's return date to Colombia on the travel authorization form that he executed prior to their departure in January 2024. Exhibit PX7, Bates No. SC000042. This date was represented to the Colombian authorities as the date that the Child would return to Colombia. Similarly to *Soulier,* Petitioner put "tourism" as the purpose

- 35 -

of the trip instead of a "permanent move." Therefore, albeit Petitioner consenting to the conditional relocation of L.C. to the United States, he only did so up until the wrongful retention date of May 16, 2024.

198.    *Swett v. Bowe,* 733 F.Supp. 3d 225 (S.D.N.Y.), *aff'd sub nom. Urquieta v. Bowe,* 120 F.4th 335 (2d Cir. 2024) is also analogous. There, the parents had an annual routine for the child to visit the father in New York from December to late February each year for the child's summer vacation. *Id*. at 254. In line with that, they had agreed for a similar vacation in late 2022. *Id*. After an intervening incident the mother only signed a travel authorization that was valid until January 8, 2023 rather than until late February (*Id*. at 255) to the father's surprise because they "had never discussed that date" (*Id*.) and had "expected that the date would be sometime later in February," "similar to the several visits [they] had taken in previous years." *Id*. The mother wanted the father to bring the child back to Chile on January 8, 2023 temporarily to discuss some ongoing issues with the original intention of letting them return to the United States a few days later to complete their normal visitation schedule. *Id*. at 275.

199.    Because of the assertion of the well settled defense, the father argued that his retention of the child became wrongful on January 8, 2023 when the travel authorization expired. *Id*. at 276. The mother argued that the wrongful retention began after February 2023, since she agreed to permit the child to stay in the United States after January 8, 2023 pursuant to the partie's earlier agreement.  *Id*. at 275. The district court found that, regardless of the parties' respective expectations, the wrongful retention occurred on January 8 because "[i]n the notarized travel authorization form she signed on December 23, 2022, [the mother] had unambiguously set January 8 as [the child's] return date, and granted [the father] permission to remove [the child] from Chile only until that date." *Id*. at 277.  The district court refused to grant the left behind parent (petitioner) the benefit of the doubt holding her to the date as reflected in the written authorization form she

signed. Even more so here, regardless of any possible discussions between the parties previously, or Respondent's expectations, Petitioner signed an unambiguous travel authorization for L.C. setting a return date of May 15, 2024.

### iii. Petitioner's Agreement for L.C.'s Move was Subject to Several Conditions

200. The conditions Petitioner placed on L.C.'s move to the United States also cuts against a finding of consent. The parties agreed prior to the move that the Child would return to Colombia in May 2024. Tr. 59: 23-25; Tr. 60:7, that the Child would reside in Florida (Tr. 91:12-13; Tr. 105:6-8; Tr. 117:5; Tr. 118:7), and that Petitioner would have unfettered and constant communication with the Child. Tr. 22:7-22. *Hofmann*, 716 F.3d at 295 (*citing Baxter*, 423 F.3d at 370) (a parent's consent for temporary removal of a child "under certain conditions or circumstances" does not indicate "that retention of the child beyond those conditions or circumstances is necessarily permissible").

201. The record reflects that Petitioner had placed both subjective and objective conditions on the Child's move to the United States. It is not for the Court to determine whether the subjective conditions, such as L.C. being well mentally and physically in the U.S., have been met. Rather, it is for Petitioner to determine whether those conditions have been met. After the trial period ended in May 2024, it was Petitioner's assessment to make on behalf of the child as the right holder.

202. The record also undoubtedly demonstrates that Petitioner's objective conditions, that the Child remain in Florida and that he return to Colombia for visitation in May 2024, were violated.

203.     Petitioner testified that while L.C. was in the United States, he was "evaluating the conditions under which the trip was allowed, and many of those conditions were not being abided by." Tr. 101:9-13.

204.     Notably, he further testified that the purpose of the Child returning to Colombia in May 2024 was "to evaluate L.C.'s adaptability in the U.S., emotions, feelings, how his health, and again, the conditions under which the agreement was established, whether they were being abided by. And assuming all conditions have been met and that I could evaluate that L.C. was really in good mental health and his adaptability and conditions and everything was fine, then he could return to the U.S." Tr. 102:1-10.

205.     If those conditions were, on the other hand, violated, Petitioner's plan "was to have [L.C.] back in Colombia where [Petitioner] was in a better position to discuss]" the issues between the parties. Tr. 102:11-15. This is substantive because the consent defense is a subjective test and should take into account any conditions or limitations that the consenting party imposed. *See Baxter v. Baxter*, 423 F.3d 363, 371-72 (3d Cir. 2005).

206.     Petitioner's and Ms. Gomez's testimony that Petitioner was to reassess the Child's situation and whether the conditions had been met upon the Child's return to Colombia in May 2024, whether it was for vacation or not, are sufficiently credible to preclude a finding of consent. This is demonstrated by the fact that (1) Petitioner placed a return date on the travel authorization form that he executed prior to move in January 2024; (2) he purchased return flights for the Child for May 16, 2024; and (3) he was to reassess the situation from Colombia with Ms. Gomez once the Child returned (Tr. 53:3-6) and if he was satisfied that the conditions had been met, it is understood that he would have permitted the Child to return to the United States.

207.     Importantly, Petitioner testified that if Respondent did not abide by his conditions, "she [would] no longer have [his] consent to be here in the United States with L.C." Tr. 93: Tr. 17-

21. It is clear that Respondent is fully aware that Petitioner retains the legal right as the non-traveling parent, pursuant to Colombian law, to give or limit his permission for L.C. to return to the United States. This knowledge is demonstrated by Respondent's sworn testimony, wherein she stated that her fear of Petitioner abducting L.C. to Colombia was rooted in the belief that he would refuse to re-sign the travel authorization form, thereby preventing L.C.'s return to the United States.

208.     As the rightful holder of consent, Petitioner withdrew his consent upon Respondent's failure to adhere to the terms of the agreement, and the reason Respondent is so fearful of allowing L.C. to return to Colombia, is because she knows that, as a consequence, Petitioner was unlikely to renew the travel authorization form.

209.     At trial, Respondent failed to meet her burden of proving that Petitioner consented to the permanent and unconditional relocation of L.C. from Colombia to the United States. In fact, the evidence conclusively showed that, at the time that Respondent moved with L.C. to the United States, Petitioner had executed a written document pursuant to Colombian law which constituted his limited consent to the Child's move. PX7, Bates No. SC000042.

## III.    <u>CONCLUSION</u>

For the reasons set forth herein, the Court should grant the Petition in its entirety and return the Child to Colombia forthwith.

Date: March 5, 2025
        New York, New York

Respectfully submitted,

/s/ Richard Min
Richard Min
Michael Banuchis
Green Kaminer Min & Rockmore LLP

420 Lexington Avenue, Suite 2821
New York, New York 10170
Telephone: 212-681-6400
Facsimile: 212-681-6999
Email: rmin@gkmrlaw.com
Email: mbanuchis@gkmrlaw.com

*ATTORNEYS FOR PETITIONER
SEBASTIAN CORREA*