UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| SEBASTIAN CORREA MORALES, | ) | Hon. Natasha C. Merle |
| *Petitioner,* | ) | |
| | ) | Civ. No. 24-7951 |
| -against- | ) | |
| | ) | |
| JULIANA ESCOBAR RESTREPO, | ) | |
| *Respondent.* | ) | |

### RESPONDENT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

On November 15, 2024, Sebastian Correa Morales ("Petitioner," "Mr. Correa") filed a Verified Petition in the U.S. District Court for the Eastern District of New York pursuant to the Hague Convention and the International Child Abduction Remedies Act, alleging that Juliana Escobar Restrepo ("Respondent," "Ms. Escobar") had wrongfully retained Petitioner and Ms. Escobar's child ("L.C.," "the Child") in the United States, and seeking the Child's return to Colombia, Petitioner's country of residence. In her Answer, Ms. Escobar contested Petitioner's prima facie case, alleging that the Child's country of habitual residence was the United States at the time of the alleged unlawful retention, and raised the affirmative defense that Petitioner consented to the Child relocating to the United States with Respondent in January 2024. The Petition was tried on February 24 - 26, 2025 with the Hon. Natasha C. Merle presiding. Pursuant to the Court's directions, Ms. Escobar hereby submits her proposed findings of fact and conclusions of law, as follows:

1

(1) The United States District Court for the Eastern District of New York has jurisdiction pursuant to 22 U.S.C. § 9003(a) (jurisdiction under the Hague Convention) and 28 U.S.C. § 1331 (federal question jurisdiction).

(2) The Eastern District of New York is the proper venue for this action because Ms. Escobar and the Child are domiciled in this District now and at the time at which Petitioner alleges that Ms. Escobar unlawfully retained the Child.

(3) Mr. Correa is a citizen of the United States and Colombia; he obtained U.S. citizenship based on his marriage to Ms. Escobar.

(4) Ms. Escobar is a citizen of the United States and Colombia.

(5) L.C. is a citizen of the United States and Colombia.

(6) Ms. Escobar moved from Colombia to the United States at the age of nine, or in about 1998. Tr. at 195.

(7) After moving to the United States, Ms. Escobar lived in the United States continuously for about 20 years. *Id.*

(8) Ms. Escobar met Petitioner in October 2014 while living temporarily in Medellín, Colombia as she studied for the MCAT exam, and the two entered into a romantic relationship. Tr. at 196.

(9) Ms. Escobar stayed in Colombia for about three months and returned to the United States in January 2015. *Id.*

(10) Mr. Correa followed Ms. Escobar to the United States in July 2015. *Id.*

(11)   Ms. Escobar and Mr. Correa were married in the United States in September 2015. Tr. at 197.

(12)   At the time of the parties' marriage, they were living with Ms. Escobar's mother in Maspeth, New York. *Id.*

(13)   The parties continued to live there until 2017, when Ms. Escobar started her degree program to become a physician's assistant, at which time they moved to Long Island, New York. *Id.*

(14)   Ms. Escobar obtained her master's degree in 2019. Tr. 195, 198.

(15)   By the time of her graduation, Ms. Escobar was pregnant with L.C. Tr. at 198.

(16)   The parties moved to Miramar, Florida in September 2019. *Id.*

(17)   Ms. Escobar received her certification to practice as a physician's assistant in October 2019. *Id.*

(18)   Ms. Escobar gave birth to L.C. on January 30, 2020. *Id.*

(19)   In January 2021, Ms. Escobar found employment as a physician's assistant providing telemedicine services for a psychiatrist's office. Tr. at 199.

(20)   In October 2021, Mr. Correa announced to Ms. Escobar that he no longer wanted to live in the United States, that he wanted to move back to Colombia, and that he would do so with out without Ms. Escobar. Tr. at 200.

(21)   Ms. Escobar told Mr. Correa she was concerned that if she moved to Colombia, she would lose her ability to work in her chosen field and would be unable to repay her student loans, which totaled about $80,000. Tr. at 200, 201.

(22)   Mr. Correa was employed as a software developer for multiple U.S. companies

3

and promised to provide for Ms. Escobar if she moved to Colombia with him. Tr. at 201.

(23) At that time, the parties' combined adjusted gross income was approximately $250,000. *Id.*

(24) The parties did not own a home in Florida because Mr. Correa had instead invested in building a house on a plot of land owned by his mother in a rural community called El Carmen, about 80 miles outside of Medellin, Colombia. Tr. 201-203.

(24) Ms. Escobar decided to move to Colombia with Mr. Correa based on his promises and for the sake of keeping her young family together. Tr. at 201.

(25) Mr. Correa, Ms. Escobar, and the Child moved to Colombia in December 2021. Tr. at 202.

(26) The house Mr. Correa had been building was not completed by the time the parties moved to Colombia, so they divided their time between Mr. Correa's mother's house in the municipality of El Carmen and Ms. Escobar's mother's apartment in Itagui, near Medellin. Tr. 202-203.

(27) The municipality of El Carmen is a rural community; it does not have a museum, a zoo, a college or university, a sports arena, or a movie theater; it has few public playgrounds, and the nearest schools are 30 to 40 minutes away. Tr. at 205.

(28) Neither the home Mr. Correa built nor the land beneath it was ever in his or Ms. Escobar's name; Mr. Correa's mother retained the title to both. *Id.*

(29) During his first year in Colombia, the Child attended daycare at a facility 30 to 40 minutes from El Carmen. *Id.*

(30) Due to HIPAA restrictions, Ms. Escobar was unable to prescribe medicine to U.S.

4

patients while living in Colombia, and she lost her telemedicine job in April 2022. Tr. 206-208.

(31)    Ms. Escobar tried, but was unable to find employment as a physician's assistant in Colombia because in Colombia her U.S. master's degree had no validity and the position of physician's assistant itself does not exist. Tr. 208-209.

(32)    The Child was diagnosed with asthma while in Colombia and he attended daycare or preschool irregularly because he was frequently sick. Tr. at 209.

(33)    The parties' relationship broke down in about July or August 2022. Tr. at 211.

(34)    In November 2022, Mr. Correa when on a pleasure trip to Qatar for 26 days. Tr. 125-126.

(35)    Finding herself alone in El Carmen with her child, Ms. Escobar moved herself and the Child out of the marital residence and into her mother's home in Itagui, near Medellin. Tr. at 212.

(36)    After Mr. Correa returned from his trip, he moved to his mother's house in Itagui. *Id.*

(37)    After the parties separated, the Child would stay at Mr. Correa's home every other weekend if Mr. Correa was in town, and the Child would visit Mr. Correa in his home for about three or four hours once a week. Tr. at 213.

(38)    At all times after the parties separated, Ms. Escobar had physical custody of the Child. Tr. at 214.

(39)    When the parties separated in November 2022, Ms. Escobar told Mr. Correa she wanted to move back to the United States. Tr. at 215.

(40)    Ms. Escobar told Mr. Correa she wanted to move back to the United States

5

numerous times throughout 2023, during the parties' family therapy sessions and at other times, in person, by text message and by telephone. *Id.*

(41)  Ms. Escobar made the "concrete decision" to move to the United States in July 2023. Tr. at 214.

(42)  In September 2023, Ms. Escobar traveled to New York City with her mother, Ana Escobar, to explore employment opportunities there among her professional acquaintances. Tr. **Juliana** and 332.

(43)  Ms. Escobar was aware of the purpose of her trip, as she had told him the purpose of her trip in person during their therapy sessions and at other times. Tr. 218, 332.

(44)  The Child stayed with Mr. Correa in Colombia during Ms. Escobar's September 2023 trip to New York. Tr. at 332.

(45)  At the parties' family therapy sessions in late 2023, Ms. Escobar and Mr. Correa discussed what form Mr. Correa's visitation would take once Ms. Escobar and the Child were living in the United States. Tr. 218-219.

(46)  The parties discussed that Mr. Correa would visit the Child in the United States whenever he pleased, and the Child would go to Colombia on vacation on an indeterminate future date. Tr. 220.

(47)  Mr. Correa expressed to Ms. Escobar at family therapy and elsewhere, on multiple occasions in 2023, that children belong with their mother. Tr. at 152.
In about August 2023, Mr. Correa hired a document preparer named Maribel Delmoral to assist him in preparing and filing a petition for divorce in the State of New Jersey. Tr. at 239.

(48)  The parties met with Ms. Delmoral in Medellin, Colombia in about August 2023,

6

to discuss the terms of the divorce, and the parties told Ms. Delmoral that Ms. Escobar and the Child were moving to the United States, where the Child was to live with Ms. Escobar. Tr. at 239.

(49) In about November or December 2023, Ms. Escobar's cousin invited her and the Child to move into her home in Kissimme, Florida while Ms. Escobar looked for employment. Tr. 220-221.

(50) In about November 2023, Ms. Escobar told Mr. Correa that she and the Child would be moving to the United States in January 2024. Tr. 221-223.

(51) On November 30, 2023 and on other occasions, Mr. Correa told Ms. Escobar in a that he accepted that Ms. Escobar was moving back to the United States to make a new life for herself, and he accepted that she was taking the Child with her, and that he simply wanted to know Ms. Escobar's plans for where they were to live, what Ms. Escobar was to do for a living, and who would care for the Child. Exhs. L, M, N, P.

(52) In about November 2023, Ms. Escobar advised the director of the Child's preschool, Semillitas del Futuro, that the Child would not be returning to the preschool in January. Tr. 223.

(53) In January 2024, Ms. Escobar sold her car in Colombia to Mr. Correa for $40,000. Tr. at 224.

(54) Ms. Escobar bought one-way tickets for herself and the Child from Medellin to Orlando, Florida, departing in mid-January 2024. *Id.*

(55) Shortly before Ms. Escobar and the Child's departure to the United States, Mr. Correa took the Child to the Office of the Civil Registry in Colombia to register the Child as a

7

Colombian citizen, without Ms. Escobar's knowledge or consent. Tr. at 219; Petitioner's Exh. 2.

(56) Mr. Correa informed Ms. Escobar on about January 12, 2024, approximately two weeks before Ms. Escobar and the Child were to depart for the U.S., that she would now have to obtain a written authorization for the Child to leave Colombia. Tr. at 219.

(57) Mr. Correa did provide a written authorization for the Child to travel to the United States. P7.

(58) The travel authorization document provided a departure date of January 26, 2024, and a return date of May 15, 2024, and indicted that the purpose of the Child's trip was "tourism." Petitioner's Exhibit 7.

(59) Ms. Escobar inquired of Mr. Correa why he had given the return date of May 15 and indicated that the purpose of the trip was tourism, and Mr. Correa replied that he did so as a formality, because the form required a return date and purpose to be entered. Tr. at 226.

(60) The Child's move to the United States was not conditioned upon his returning to Colombia on May 15, 2024 or on any specific date at all. Tr. at 215, 216, 218-219, 325, 333.

(61) Once in Florida, the Child attended preschool and daycare, spent time with family members, played with other children in the neighborhood, went bicycle riding, and engaged in other activities befitting a child his age. Tr. 229 - 234 and 335; Exhs. B1-B6.

(62) The Child began learning English in school once he and Ms. Escobar settled in Florida. Tr. at 342.

(63) The Child received regular medical care in the United States from the time of his arrival in January 2024 through May 2024 and beyond. Tr. at 341.

(64) In April 2024, Ms. Escobar received via email a Verified Complaint for Divorce

8

field by Maribel Delmoral in New Jersey Supreme Court on February 14, 2024 in Mr. Correa's name. Tr. 240; Exh. A.

(65) The Verified Complaint states that Ms. Escobar is domiciled in Queens, New York and Mr. Correa is domiciled in New Jersey. Exh. A.

(66) The Verified Complaint is signed above Mr. Correa's name, and the signature reads "Sebastian Correa." *Id.*

(67) The Verified Complaint calls for Ms. Escobar to retain physical custody of the Child, with legal custody shared jointly by Ms. Escobar and Mr. Correa. *Id.*

(68) On or about April 7, 2024, Mr. Correa proposed a vacation with the Child from about May 17 or 22 of 2024 in which he would take the Child with him to Europe and then to Colombia before returning him to the United States between June 8 and June 13, 2024. Exh. AA; Tr. at 242.

(69) Mr. Correa then purchased airline tickets for Ms. Escobar and the Child to travel to Colombia together on May 16, 2024. Tr. at 244; Petitioner's Exh. 9.

(70) After consulting with attorneys in the United States, Ms. Escobar determined that she could not proceed with the New Jersey divorce action while living in Florida, and determined that it was not advisable for the Child to travel to Colombia until there was a custody order in place  Tr. at 244, 284.

(71) In mid-May 2024, Ms. Escobar and the Child moved from Kissimmee, Florida to the home of Ms. Escobar's mother and stepfather in Queens County, New York. Tr. at 281, 292, 330.

(72) Ms. Escobar did file for a custody order in Queens Family Court in June 2024. Tr.

9

296-297.

(73)     In May 2024, at the time Petitioner alleges Ms. Escobar wrongfully retained the Child in the United States, the Child's country of habitual residence was the United States.

(74)     By May 2024, the Child was fully acclimated to the United States: he had been attending school, learning English, receiving routine medical care, socializing with children his own age, including family members from Florida and Georgia.

(75)     Petitioner has therefore failed to make a prima facie case that Ms. Escobar wrongfully retained the Child.

(76)     Moreover, there is no credible evidence in the record that the Child moving to the United States was subject to conditions such as the Child vacationing in Colombia in May 2024 or returning to Colombia on May 15, 2024.

(77)     Whatever Petitioner's reasons may have been for entering a return date of May 15, 2024 on the travel authorization he provided to Ms. Escobar, it is clear that this document does not comprise an agreement between the parties as to the conditions of the Child's relocation to the United States — indeed, the ticket Mr. Correa purchased for Ms. Escobar and the Child to travel to Colombia on vacation was for a date *after* May 15, 2024.

(78)     The credible evidence in the record establishes that Mr. Correa gave his consent for the Child to move back to the United States permanently with Ms. Escobar.

(79)     As Petitioner has failed to establish that Petitioner's consent for the Child to move to the United States with Ms. Escobar was conditioned on the Child returning to Colombia in May, or on the Child remaining in Florida, it follows that Ms. Escobar did not violate any conditions of said consent.

(79) Ms. Escobar has shown by a preponderance of the evidence that Petitioner consented to the Child's relocation to the United States, and her retention of the Child after May 2024 was not unlawful.

      Respectfully submitted,

Dated: Bath, New York
      March 5, 2025

/s/ Edgar Loy Fankbonner
Edgar Loy Fankbonner
Goldberger & Dubin, PC
401 Broadway, Suite 306
New York, New York 10013
Tel.: (917) 796-7406
fankbonner@gmail.com
*Attorneys for Respondent*

11

CERTIFICATE OF SERVICE

      I certify that I caused a true and correct copy of the foregoing submission to be served upon the following parties by uploading a true and correct copy thereof to the Court's ECF portal:

Camilla Redmond, Esq., Richard Min, Esq., and Michael Banuchis, Esq.
Costal Green Kaminer Min & Rockmore LLP
420 Lexington Ave. Ste. 2821
New York, NY 10170

Dated: New York, New York
       March 5, 2025

/s/ Edgar Loy Fankbonner
Edgar Loy Fankbonner
Goldberger & Dubin, PC
401 Broadway, Suite 306
New York, New York 10013
Tel.: (917) 796-7406
fankbonner@gmail.com
*Attorneys for Respondent*